John SLATKY, Plaintiff,

v.

AMOCO OIL COMPANY, Defendant.

Civ. A. No. 85–1122.

United States District Court,
M.D. Pennsylvania.

Jan. 28, 1986.

Joel Weisberg, Harrisburg, Pa., for plaintiff.

John A. Guernsey, William A. DeStefano, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT

CALDWELL, District Judge.

1. Plaintiff, John Slatky, operates a service station located at 1001 West Market Street in the City of York, Pennsylvania under a lease agreement and dealer supply agreement with defendant, Amoco Oil Company.

2. Defendant, Amoco Oil Company, is the owner of a service station facility located at 1001 West Market Street, York, Pennsylvania.

3. Plaintiff's and defendant's most recent lease and supply agreements are dated August 17, 1982 and run from September 1, 1982 until August 31, 1985.

4. By a letter dated May 29, 1985, defendant informed plaintiff that his lease would not be renewed and that any attendant franchise relationship would be terminated effective August 31, 1985.

5. The letter of May 29, 1985, further stated that in compliance with the requirements of the PMPA defendant would by separate letter, provide plaintiff with "a personal and nontransferable opportunity to purchase defendant's fee property and improvements thereon."

6. By letter dated June 28, 1985, defendant offered to sell plaintiff the station property for $306,300.00. This initial offer did not include the underground tanks and pumps.

7. Defendant's offering price for the property was determined by its employees who value any property that defendant intends to buy, sell or lease. Defendant's employees followed the procedures which it uses in the valuation of any of its property being offered for sale.

8. Defendant's general procedure for determining the offering price of property is to conduct an initial appraisal of the land and real estate improvements by its employees. The initial appraisal is transmitted for review to the real estate manager and project team director. If there are any questions from the review, the property is reappraised or the appraisal otherwise corrected. The offering price is then determined by defendant's capital asset Manager. The district manager for the area in which the property is located also participates in this process.

9. Mr. M. O'Dell performed the initial appraisal of the land value of 1001 West Market Street in York in early May, 1985. Mr. C. Bogdanowicz performed the initial appraisal of the property improvements. These appraisals were reviewed by Messrs. Compton (Real Estate Manager), O'Brien (Project Team Manager) and L. Warfield (District Manager). A reappraisal of the land value was requested and was performed by Mr. O'Dell in latter May, 1985. The offering price was determined to be $306,300.00 and was communicated to plaintiff.

10. By a letter dated July 25, 1985, plaintiff through counsel advised defendant that he was interested in purchasing the property, and that his independent appraisal had valued the property at only $158,200.00, including the tanks and dispensers.

11. Through a telephone conversation with plaintiff's counsel and by a letter dated July 30, 1985, defendant rejected plaintiff's counter offer.

12. The parties through a stipulation filed by counsel on August 16, 1985, and approved by the court, agreed to maintain the *status quo* pending a determination of the merits of the issues raised by plaintiff.

13. In a letter to plaintiff's counsel dated August 26, 1985, defendant through its counsel, amended its offer to sell from $306,300.00 to $256,300.00, not to include the pumps and tanks. Defendant indicated that it was prepared to negotiate for the sale of the underground tanks and pumps at an additional price of $50,000.00.

14. Defendant's policy in offering service stations properties for sale is to exclude underground tanks and pumps for environmental reasons. Should the prospective purchaser wish to purchase such

items, its policy is to negotiate for their sale as long as all Amoco-identifying marks on the pumps are removed, the underground tanks pass Kentmoor tests to verify structural integrity and the purchaser agrees to indemnify defendant for any liability arising from the use of the underground tanks.

15. Plaintiff had two appraisals performed by MAI certified appraisers which valued the property at $158,200.00 and $145,000.00 respectively. The $145,000.00 appraisal does not include the pumps and tanks but the $158,200.00 appraisal did.

16. Defendant also hired a MAI certified appraiser who appraised the property at $221,000.00, not including the pumps and tanks.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this action under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq.

2. Plaintiff and defendant have established a franchise relationship through the written lease and other agreements of the parties.

3. Defendant determined in good faith and in the normal course of business that renewal of the franchise relationship with plaintiff was likely to be uneconomical to it despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to plaintiff.

4. Defendant's notice to plaintiff of its determination not to renew the lease agreement complied with the requirements of the PMPA.

5. Defendant's offer to sell its interests in the station premises to plaintiff was bona fide under the PMPA. Plaintiff did not accept the offer.

6. Defendant is entitled to an order of ejectment directing that Mr. Slatky vacate the premises within twenty (20) days of this order.

7. Plaintiff was lawfully in possession of the service station in accordance with the terms of the stipulation signed by the parties on August 16, 1985 and thus defendant is not entitled to judgment on its counterclaim.

## MEMORANDUM

Plaintiff brought this action under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq. alleging that defendant did not make a bona fide offer to sell him the service station located at 1001 West Market Street. Pursuant to 15 U.S.C. § 2802(b)(3)(D)(iii) defendant was obligated to make "a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises...." The term "bona fide" however, is neither defined by the PMPA nor discussed in its legislative history. Defendant has the burden of proving that its offer to sell was "bona fide." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S. Code Cong. & AD.News 873, 874.

We have only found two cases which have defined the term "bona fide." In *Brownstein v. Arco Petroleum Products Co.,* 604 F.Supp. 312 (E.D.Pa.1985) the plaintiff brought an action substantially identical to the present one. There, the plaintiff complained that defendant's offer of $290,000.00 was not a "bona fide" offer because it was greater than the fair market value of the property. Defendant argued that it may offer the property to plaintiff at any price so long as the offer is made without malice. Rejecting defendant's contention, the court established the following two-part test:

First, I believe that for a court to conclude an offer is bona fide or *actual,* especially when viewed against the PMPA's concern about pretextual nonrenewals, the defendant must demonstrate *at the very least* that the offer was made in conformity with the offeror's *general* practice for selling property....

Moreover, even had Arco demonstrated that the procedures by which it arrived at the offering price were consistent with those utilized in non-PMPA-restricted cases, I am not convinced that it would have satisfied the strictures of the

Act. In light of the generally slim profit margins available to petroleum franchisees, *see Brown, supra,* at 657, and Congress' desire to avoid pretextual terminations or nonrenewals, a proper reading of the Act compels the conclusion that for an offer to be bona fide—that is *actual*—it must meet or very nearly approach what the offeror believes to be the fair market value of the property. Any increase over fair market value could clearly make a difference in the ability of the franchisee to accept the offer. I cannot believe Congress intended that the elaborate mechanism which it set up in the PMPA could be by-passed by a franchisor's simply setting a price substantially in excess of what it believes to be the fair market value, whether or not it is beyond the franchisee's ability to pay.

*Id.* at 315. (footnote omitted).

More recently in *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005 (3d Cir.1985) the Third Circuit interpreted the term "bona fide" in a slightly different context. In *Robertson,* the plaintiff challenged the decision of defendant not to renew the franchise agreement. Defendant discontinued the agreement because it had received numerous complaints from customers concerning plaintiff's operation of the service station. The issue before the court was whether the customer complaints were "bona fide" within the meaning of the PMPA.[1] Defining the term "bona fide" the court stated:

> A definition of "bona fide" in PMPA that accommodates (sic) common usage and is fair to all parties is "sincere and having a reasonable basis in fact." The "basis in fact" requirement entails that the circumstance complained of does, in fact, exist, and that the franchisee can reasonably be held accountable for it. Thus the receipt of numerous sincere complaints is not ground for non-renewal if the complaints are false or if they pertain to matters about which the franchisee is not culpable, e.g., policies re-

quired by the franchisor. This interpretation comports with both purposes of PMPA: protection of franchisees from arbitrary non-renewal and protection of franchisors from disruptive franchisee conduct that damages the brand name. *See Rodgers v. Sun Refining and Marketing Company,* 772 F.2d 1154, 1158 (3d Cir.1985).

At 1008.

■■■ Applying the *Robertson* definition, we conclude that defendant's offer was "bona fide." Plaintiff maintains that defendant's offer was not "bona fide" because the selling price was not reached in a reasonable manner. The purpose of PMPA is to "protect franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted* in 1978 U.S. Code Cong. & Ad.News 873, 874. Thus, we must determine whether defendant had a reasonable basis for making its offer. *See Brownstein, supra; Shell Oil Co. v. Neuenfeldt,* 2 CCH Business Franchise Guide Para. 8120 (C.D.Cal.1983). The evidence produced at the hearing revealed that defendant's offer was made in the ordinary course of business, employing the procedures normally used for evaluating property. More specifically, Mr. O'Dell and Mr. Bogdanowicz showed precisely how they appraised the respective values of the land and the improvements on the land. Although Mr. O'Dell was requested to reappraise the land which resulted in a higher valuation, there is no evidence that he was directed to increase his appraisal. Instead, as Mr. O'Dell testified, the increased valuation was the result of a more critical and thorough appraisal. Although Mr. O'Dell and Mr. Bogdanowicz did not apply formal appraisal techniques, the procedures used by them were reasonable. Additionally, we note that the PMPA does not require the use of accepted appraisal methods, but only seeks to prevent arbitrary decisions. Here, we find that defendant's offer was not arbitrarily made.

---

1. Pursuant to 15 U.S.C. § 2802(b)(3)(B) the receipt of numerous bona fide consumer com-

plaints is a basis for nonrenewal of a franchise agreement.

■ Plaintiff relying upon *Brownstein, supra,* maintains that the offer must approach the fair market value of the property. We reject this contention for two reasons. First, the PMPA does not require franchisors to sell the property at the fair market value. If Congress had intended for sales to be made at the fair market value, Congress would not have used the term "bona fide." Second, plaintiff's reliance upon *Brownstein* is misplaced. In *Brownstein,* the defendant's offer was substantially greater than what it believed to be the fair market value of the property. Responding to this excessive offer, the court held that the offer must approach what the *offeror* believes is the fair market value. It does not follow, however, that defendant's offer must approach the fair market value as determined by plaintiff's appraisers. Furthermore, defendant has offered the property at what it believes is the fair market value of the property. Based upon these considerations, we find that defendant's offer was sincere and has a reasonable basis.

■ Plaintiff argues next that defendant's offer was not "bona fide" because it did not include an offer to sell the underground tanks and gasoline dispensers. In support of their position plaintiff cites *Roberts v. Amoco Oil Corp.,* 740 F.2d 602 (8th Cir.1984) and *Greco v. Mobil Oil Corp.,* 597 F.Supp. 468 (N.D.Ill.1984). To the contrary, defendant asserts that the *Roberts* decision has been rejected by the Third Circuit and even if it has not, it has made an offer to sell the tanks and dispensers.

As plaintiff correctly points out, several courts have held that a bona fide offer must include an offer to sell the tanks and dispensers. *See e.g. Roberts, supra.* In the instant case, defendant's original offer did not include tanks and dispensers. This offer was, however, amended on August 26, 1985, to include this equipment. Without deciding whether *Roberts* is good law in this circuit, we conclude that defendant, by amending its original offer to include

tanks and dispensers, made a bona fide offer. The fact that they were not included in the original offer does not change our decision since the offer to sell them was made within the 90 day limitation imposed by 15 U.S.C. § 2802(b)(3)(D)(iii).[2]

■ Finally, defendant has made a counterclaim for damages caused by plaintiff's unlawful possession of the service station beyond August 31, 1985, the lease expiration date. Defendant claims that it is entitled to either lost profits arising from diminished gasoline sales or liquidated damages as provided by the lease. Plaintiff maintains that he remained in possession of the property in accordance with the terms of a stipulation signed by the parties. Based upon this stipulation plaintiff argues that defendant is not entitled to damages. The record reveals that the parties entered into a stipulation on August 16, 1985 which provides that the parties would maintain the *status quo* pending resolution of their dispute. Based upon this agreement, we conclude that plaintiff was properly in possession of the premises and therefore defendant is not entitled to damages. In addition, we note that an award of damages would be inconsistent with the PMPA.

---

**2.** Section 2802(b)(3)(D)(iii) provides that the franchisor must make a bona fide offer to sell

within ninety (90) days of the notice of nonrenewal.