In re **REDPATH COMPUTER SERVICES, INC., Debtor.**

In re **ISOTECH MARKETING, INC., Debtor.**

**Bankruptcy Nos. B–94–10160–PHX–GBN, B–94–10161–PHX–GBN.**

United States Bankruptcy Court, D. Arizona.

May 15, 1995.

Russell A. Kolsrud, Norling, Perry, Pierson & Kolsrud, P.L.C., Phoenix, AZ, for Regional AHCCCS Health Plan, Inc.

Robert M. Cook, Law Offices of Cook and Meda, Phoenix, AZ, for debtors.

ORDER

GEORGE B. NIELSEN, Jr., Chief Judge.

Redpath Computer Services is one of two debtors in possession in a jointly administered Chapter 11 case. At issue is whether a licensee's termination of debtor's services under an executory agreement involved an "at will" contract or instead was a void action taken in violation of the automatic stay. 11 U.S.C. § 362(a)(3). This Court concludes the latter occurred, given the contract's terms and the parties' actions. The facts necessary for an understanding of this decision follow.

I

Debtor's President, Gary Goodenow, drafted a "Non–Exclusive End–User License Agreement: Object Code," which is the subject of this dispute. The agreement was signed on October 1, 1992, by debtor and Regional AHCCCS Health Plan, Inc. ("RAHP").

Pertinent agreement terms include the following:

Licensor desires to grant to Licensee, and Licensee desires to acquire from Licensor, a non-exclusive right and license to use certain computer software....

....

2.1 Subject to compliance by Licensee with the terms hereof, Licensor hereby grants to Licensee, in perpetuity unless terminated as provided herein, a personal, non-exclusive (without the right of sublicense), license to:

....

4.1 In consideration of the licenses granted hereunder, Licensee shall pay Licensor the sum of [$1.30] per member active on the first day of each month....

If licensee has no active members during any given month, Licensee shall not be liable for any payments to Licensor for that month.

. . . .

7.1 This Agreement ... shall remain in force for a period of Sixty (60) months, until terminated as provided below, and shall be automatically renewed on a yearly basis, unless one party shall notify the other in writing of termination 90 days' prior to any anniversary date after the Fifth (5th) year.

7.2 Either Licensee or Licensor may, upon written notice and subject to the provisions of this Section respecting notice and right to cure, terminate this Agreement for cause upon the occurrence of a material and continuing breach of the terms of this Agreement. Written notification expressly identifying such breach shall be furnished to the breaching party, whereupon such party shall have 30 days to remedy the specific breach or demonstrate that no such breach has occurred. Failure to cure the identified breach within such 30 day period shall constitute cause for immediate termination.

7.3 Upon termination of this Agreement for any reason, Licensee shall immediately cease use of, and return forthwith to Licensor, the Licensed Program and Licensed Documentation, and any copies of portions thereof, including Maintenance Modifications or Enhancements.

Ms. Sheri Core is the administrator of RAHP. She states by affidavit that RAHP has always interpreted its agreement with debtor as nonexclusive. That is, debtor was free to market its software to others. RAHP was free to utilize the computer services of others. She alleges the parties never interpreted the agreement as requiring RAHP to exclusively use debtor's services. There is nothing in the agreement stating that all of RAHP's needs for computer services must come from the debtor, she believes.

Gary Goodenow testified in his December 20, 1994 deposition that he drafted the agreement. Transcript at 25. When asked about paragraph 2.1 of the agreement granting a nonexclusive license, Goodenow said his personal, nonlegal definition was: "It means they can use it and may want other people to use it, so, in other words, there's not an exclusive license, they are not the only people in the world to have it." Transcript at 29.

When asked whether the licensee could use other companies if it wanted, Goodenow answered with a question: "Other software companies?" The response was "sure." Goodenow responded with his own "sure." *Supra.*

Debtor filed Chapter 11 on November 15, 1994. On December 8, 1994, RAHP filed a motion to require debtor to assume or reject this executory contract. Administrative Docket No. 12. Movant stated it provides care to indigent patients under a contract with the Arizona Health Care Cost Containment System. Under a contract with the state, it must maintain a complex computer system to track members, pay claims and file reports. Docket 12 at 2.

To maintain this computer system, movant entered into the contract with debtor. On December 8, 1994, without notice, debtor allegedly took action to prevent RAHP from operating the computer system. Movant alleges that under the agreement, if debtor thought movant was in default, debtor is required to give 30 days' notice with an opportunity to cure. Debtor failed to do this, and thus itself was in default. Motion at 2, Docket 12. Movant sought an order requiring debtor to assume or reject the contract under section 365. 11 U.S.C. § 365(d)(2), *supra* at 3–4.

In response, debtor stated that on December 8, 1994, after notice, and due to the movant's failure to pay timely, debtor stopped providing computer services. Docket 20 at 2. Debtor stated it was paid by movant, and computer services were reinstated. Such services allegedly continue to be provided under the agreement. *Supra.*

Redpath desired to assume the contract and disputed any default. However, if there was a default, it would be cured. Debtor said it would provide adequate assurances it would promptly compensate for actual pecuniary loss resulting from default and would

provide adequate assurance of future performance.

Debtor noted this contract is essential to an effective reorganization and is worth about $25,000 per month to the estate. *Id.* at 3.

At a hearing on December 21, 1994, the parties disputed whether the defaults were cured. The hearing was continued. Minute Entry at Docket 24.

On January 12, 1995, Redpath filed an emergency motion for approval of its assumption of this executory contract. Docket 30. In that motion, debtor stated it was not in default. To the extent RAHP disagreed, debtor stated it met with RAHP and demonstrated it was in full compliance.

Debtor alleged despite its efforts to resolve any dispute, RAHP unilaterally canceled the contract on January 10, 1995. It was further claimed RAHP unlawfully withheld about $9,000 from amounts it owed debtor.[1] *Supra* at 3.

Debtor argues RAHP had no authority to cancel the agreement. Redpath alleges this violates the automatic stay, as an executory contract that is estate property can only be terminated after stay relief is granted.

Debtor urges that when a stay violation was alleged at the February 6, hearing, RAHP quickly changed its approach. Creditor now argues the contract was nonexclusive and RAHP could unilaterally choose to rely on another vendor.

Creditor responds that debtor's president wrote the agreement. He designated it as a nonexclusive user license. He stated that RAHP acquired a nonexclusive right and license to use computer services. In his deposition, when asked whether the nonexclusive nature of the agreement included the licensee, he stated RAHP could use other software companies.

RAHP says these statements by Goodenow are judicial admissions and proof of the facts admitted. Debtor's current position is thus contrary to its judicial admissions, creditor argues.

RAHP says the Court must enforce the agreement, according to the intention of the parties. Both interpret the agreement to mean it is nonexclusive. Both agree RAHP may use other software companies. Therefore, RAHP is free to service its business from third party computer suppliers, other than debtor, and is within its contractual rights not to use debtor's services on an exclusive basis. Since Goodenow drafted the agreement, it is construed against debtor.

In reply, debtor argues Goodenow stated in his deposition that he drafted the document from a form book. This allegedly defeats RAHP's contention that Goodenow purposefully and intentionally chose the word "nonexclusive" because he did not want RAHP to be bound.

Second, Goodenow is not a lawyer and, unlike RAHP, was not represented by counsel at the time of drafting or execution of the agreement.

Third, RAHP distorted his deposition testimony. When questioned about the meaning of the word "nonexclusive," Goodenow stated: "[T]hey can use it and may want other people to use it, so, in other words, there is not an exclusive license, they are not the only people in the world to have it. That would be my personal, nonlegal definition." Reply, Docket 47. This means debtor had the option of allowing other companies to use the software. It does not mean RAHP is free to disregard its contractual obligations, it is argued.

## II

■ An executory contract that is property of the estate can only be terminated after a grant of relief from stay. *Richard J. Carroll v. Tri–Growth Centre City (In re Carroll),* 903 F.2d 1266, 1271 (9th Cir.1990). *See also Computer Communications, Inc. v. Codex Corporation (In re Computer Communications, Inc.),* 824 F.2d 725, 729–30 (9th Cir. 1987).

---

1. No copy of the termination letter was included as an exhibit. However, debtor alleged counsel for RAHP stated: "As you know, Regional deems the contract rejected and has terminated the agreement with Redpath effective at the end of this month." Docket No. 42, at 2.

RAHP argues it did not violate the stay by sending the post-petition termination letter. It asserts it was doing what the contract allows it to do: use other computer companies. RAHP believes this is Goodenow's understanding as well.

█ RAHP is correct that the Bankruptcy Code neither enlarges the contract rights of a debtor, nor prevents termination of a contract by its own terms. *In re Carroll, supra,* at 1271. For example, in *Moody v. Amoco Oil Co.,* 734 F.2d 1200 (7th Cir.1984), *cert. denied,* 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984), Amoco sent 90 day termination letters to debtor concerning a franchise. Debtor filed bankruptcy and sought to assume before the 90 days expired. 734 F.2d at 1204–06.

Although the 90 days had not expired, the court held debtor could not assume the agreements. Debtors had no contract right to cure once the termination notices were mailed. Amoco did not have to take any further action to end the contracts. Termination was automatic at the end of the specified term. *Supra* at 1212–13.

The fact that termination was not effective for 90 days did not affect the result. The filing of the petition did not expand debtor's rights. Thus, debtor had only a right to 90 days worth of dealership contracts. *Moody v. Amoco Oil Co., supra.*

The court held "the automatic stay does not toll the mere running of time under a contract, and thus it does not prevent automatic termination of the contract.... Section 362 does not give a debtor greater rights in a contract.... Thus, debtors cannot rely on section 362 to prevent termination of the contracts." *Id.* at 1213.

In a similar case, the Ninth Circuit cited *Moody* with approval. *Atlantic Richfield Co. v. Herbert (In re Herbert),* 806 F.2d 889 (9th Cir.1986). The court held "even if the franchise agreement was executory on the date of filing, it had by then a duration of only two days. During that short period, the agreement, if executory, was still in existence and therefore possibly assignable-albeit only to the extent of its forshortended duration." *In re Herbert, supra,* at 893 n. 6.

█ In the present case, the contract establishes two termination events: (a) the contract will expire in five years, but is automatically extended for an additional year absent timely notice, section 7.1 and (b) the contract can be ended for cause. Section 7.2. Based on these provisions, this is not an "at will" agreement. Expressed cause is needed to end the contract before the five year term.

RAHP insists it is not terminating the contract, but only exercising a right under this nonexclusive agreement. RAHP asserts it has the right under the agreement to use other contractors. While there is little in the contract that suggests this right,[2] creditor points to extrinsic evidence of intent. Specifically, RAHP points to the affidavit from Ms. Core and deposition testimony from Goodenow.

### III

When parol evidence is at issue, the bankruptcy court usually applies state law. Hon. Barry Russell, Bankruptcy Evidence Manual § 51, p. 122 (1994–95 ed.) *See generally Commercial Paper Holders v. Hine (Matter of Beverly Hills Bancorp),* 649 F.2d 1329, 1335 (9th Cir.1981) (applying California parol evidence law).

█ In Arizona, there are two steps in interpreting a contract. *Taylor v. State Farm Mutual Auto Insurance,* 175 Ariz. 148, 153, 854 P.2d 1134, 1139 (1993). First, the court considers evidence that allegedly determines the extent of integration, illuminates the meaning or establishes the intent. The court's function at this stage is to eliminate evidence with no probative value in determining intent. The second step involves completing the court's understanding of the contract. There, the parol evidence rule applies and precludes admission of extrinsic evidence that varies or contradicts the meaning of the writing. *Taylor, supra,* 175 Ariz. at 153, 854 P.2d at 1139.

2. Section 4.1 merely provides RAHP is not charged a fee when it has no active members on the system during a particular month. It does not state RAHP can unilaterally abandon the contract. Docket 44, Exhibit B.

When interpreting a contract, it is fundamental that a court give effect to the intention of the parties at the time the contract was made. *Id.* at 1139. If the parties intend a special meaning, and that meaning is proved by credible evidence, the agreement is enforced according to this intent, even if the language might ordinarily mean something different. *Id.* Ambiguity is not the only linchpin to admit parol evidence. The better rule is for the court to first consider the evidence offered. If the court finds the contract is reasonably susceptible to this interpretation, then the evidence is admissible to determine the meaning intended. *Id.*

In applying these rules, RAHP says both debtor and RAHP intended the contract to be nonexclusive. Both agreed RAHP may use other software companies. The problem with this position is (1) the contract does not clearly state this, and (2) RAHP's earlier conduct contradicts the argument it may shift to another service at any time.

When RAHP filed its motion to compel, it discussed its complex computer system. To maintain this system, RAHP asserts it entered into the present contract. Movant said if debtor did not immediately assume or reject the contract, it would have to quickly obtain computer services from another source. RAHP noted under the agreement, if debtor thought RAHP was in default, debtor had to give the required notice. RAHP stated it had provided notice debtor was in default.

A letter dated December 8, 1994 from RAHP's counsel asserts debtor is in material breach. RAHP gave notice of the breach and its intent to terminate. The letter notes for the past 10 to 14 months debtor's services were "seriously deficient and far below normal performance standards for the purposes of the Agreement." *See* Letter attached as Exhibit B to Docket 12.

All of this suggests RAHP (1) believed its remedies were limited to seeking relief under section 365 requiring debtor to either assume or reject the contract and/or section 7.2 of the agreement allowing termination for cause, and (2) it generally had only one computer service supplier maintaining the system. It is difficult to believe RAHP felt it could call on other vendors to maintain this complex system at will and did not intend to rely solely on debtor's services, when it signed the agreement. If RAHP believed the contract automatically authorized use of other suppliers, why did it invoke section 7.2? Why did it file a § 365(d) motion?

RAHP's conduct belies its interpretation the contract allows it to switch suppliers at will. It is estopped from taking a fundamentally different position from that asserted earlier. Earlier, movant sought remedies under section 365. Before the court could rule, RAHP terminated the contract, suggesting all along the parties interpreted the contract as allowing a switch of suppliers at will.

The parol evidence offered by RAHP contradicts the terms of the agreement, rather than aids in interpretation. Its position is not reasonable, given its earlier conduct and a fair reading of the document.

## IV

Further, if RAHP is correct in its interpretation it may replace debtor at will, this would be an illusory contract. As noted by the Arizona Supreme Court:

> It is hornbook that an illusory contract is unenforceable for lack of mutuality. "Parties are, within reason, free to contract as they please, and to make bargains which place one party at a disadvantage; but a contract must have mutuality of obligation, and an agreement which permits one party to withdraw at his pleasure is void."

*Shattuck v. Precision–Toyota, Inc.,* 115 Ariz. 586, 588, 566 P.2d 1332, 1334 (1977).

Preference must be given to reasonable interpretations as opposed to those that are unreasonable, or that make the contract illusory. *Kennewick Irrigation District v. United States,* 880 F.2d 1018, 1032 (9th Cir. 1989). RAHP's interpretation is unreasonable and renders the contract illusory. The agreement, as interpreted by RAHP, gives it the immediate right to select another computer company without notice, without detriment to RAHP, and without benefit to debt-

or. Yet the contract expressly requires notice and cause for termination.[3] RAHP's interpretation is not what the parties intended, based on a fair reading of the agreement. The parties anticipated a fairly long-term relationship, automatically renewed after five years for an additional year, unless one of the parties timely gave notice. Ending the agreement before the term expired requires a material and continuing default, proper notice and a cure period. *See* §§ 7.1 and 7.2, *supra.*

## V

It does not appear the parties intended to allow unilateral withdrawal. RAHP's behavior before the attempted termination demonstrates an intent to work within the confines of section 365 and the contract. The attempted termination was just that: a termination, not merely exercise of a right under the contract to use other suppliers. As such, there was a stay violation. 11 U.S.C. § 362(a)(3).

ORDERED ACCORDINGLY.

---

**3.** In fact, the contract provides RAHP a license "in perpetuity" unless terminated as provided in the agreement. Contract, § 2.1, at 2. Docket No. 44, Exhibit B.