Joseph S. SIECKO and Darryl Billemeyer

v.

AMERADA HESS CORPORATION.

Civ. A. No. 82–2088.

United States District Court,
E.D. Pennsylvania.

Aug. 29, 1983.

Norman Zarwin, Robert P. Weiner, Philadelphia, Pa., for plaintiff.

Carole E. Handler, Philadelphia, Pa., for defendant.

## MEMORANDUM

BECHTLE, District Judge.

This is an action brought by Darryl Billemeyer, a franchisee-lessee gasoline dealer, against Amerada Hess Corporation ("Hess"), his franchisor-lessor, under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* ("PMPA"). Billemeyer also asserts a state law claim for breach

of fiduciary duty. The complaint is based upon a new Dealer Agreement which Hess required Billemeyer to execute in August, 1981, resulting in an increase in Billemeyer's rent on his gasoline station. Presently before the Court is Hess' motion for summary judgment. For the reasons that follow, the motion will be granted.[1]

## FACTS

Hess, a refiner and marketer of petroleum products, sells gasoline at retail stations in 14 eastern and southern states, including Pennsylvania. Some of these stations are operated and managed by Hess itself with its own employees. The rest are dealer-operated stations, in which dealers lease the underlying land, station, and improvements from Hess under Dealer Agreements. Hess pays for all capital improvements at its station sites. Its dealers make no capital improvements in the station properties. In each instance Hess constructs the service station building and outfits the property with pumps, tanks, lighting, piping and landscaping. Thereafter Hess maintains the station improvements. Hess also pays all property taxes on the stations. Thus, under the terms of the Dealer Agreement, Hess franchisees incur no expenses with respect to the underlying land or the improvements thereon, nor do the franchisees pay any franchise fee to Hess.

Plaintiff Billemeyer has been a Hess franchisee since April, 1971, at Hess station # 38219 located at Routes # 202 and # 309 in Montgomeryville, Pennsylvania. From 1971 until December 1, 1981, he operated pursuant to a Dealer Franchise and Sales Agreement and a Dealer Lease under which his rent to Hess for the station was determined by the volume of gasoline Hess sold to the station. The monthly rental equaled 1 cent per gallon for the first 60,-000 gallons delivered, 1½ cents per gallon from 60,000 to 150,000 gallons, 1¾ cents from 150,000 to 200,000 gallons, and 2 cents

---

1. The appropriate standard against which a motion for summary judgment should be gauged is set out in *Federal Laboratories, Inc.*

*v. Barringer Research Ltd.,* 696 F.2d 271 (3d Cir.1982).

per gallon for each gallon in excess of 200,-000 gallons.

In the Spring of 1981, Hess adopted a new dealer rental program as a result of the recommendation of Norman Goldberg, the Senior Vice President of Marketing for Hess. The recommendation was based upon statistics which documented Hess' escalating ownership and maintenance costs in the face of a steady decline in rental income from the dealer properties. The economic circumstances which led to the restructure of the rental formula, as well as the details of Hess' two phase program to implement the change, are set out at length in *Meyer v. Amerada Hess Corp.,* 541 F.Supp. 321, 323–326 (D.N.J.1982), and need not be repeated here.

As distinguished from the old cents-per-gallon rent calculation, the most salient characteristic of the new rent calculation was its introduction of a flat fee. The amount of the fee was individually set for each station according to the same standardized formula. The formula took the market value of the land and the replacement cost of the improvements, added them together, and multiplied the sum by 8%. The resulting figure as to any particular station equaled the annual rent on that station which, when divided by 12, yielded the station's monthly rent.

In order to apply the formula to the individual station sites Hess hired an experienced independent real estate appraiser, Britton Appraisal Associates, Inc., to determine the market value of the land, as if unimproved, at all of the stations at their highest and best use. With the assistance of local appraisers working under Britton's supervision, a written evaluation was prepared for each station property based on sales of comparable properties. Hess did not inform Britton why it wanted the appraisals, and Britton did not learn that the appraisals were part of an overall restructuring of dealer rentals until after the reports were completed. To determine the value of the improvements at each station, Hess selected a replacement cost standard. Actual replacement cost was then derived after the results of an on-site inspection and inventory of improvements were applied to the figures from a construction manual containing geographical adjustments for factors such as labor rates.

In July, 1981, Hess presented plaintiff and 140 of its other dealers whose leases were about to expire with new Dealer Agreements containing a flat monthly rental based on uniform application of the above rental formula. Under the agreement given to plaintiff, his new monthly rental was $2,264.00. This, when compared to an average monthly rental for 1981 of $946.75, represented an increase of over 130%. Plaintiff subsequently learned that the new rental was based on an appraised land value for his station of $194,000.00 and an asserted replacement value for the improvements thereon of $145,615.00. (($194,-000 + $145,615) × .08 = $27,169 divided by 12 = $2,264). Plaintiff signed the new Dealer Agreement in August, 1981, and it became effective on December 1, 1981, as did the new Dealer Agreements for all other Hess dealers.

Plaintiff paid his new rent from December 1, 1981, through March, 1982, when Hess implemented a 20% temporary voluntary rent adjustment ("TVRA") retroactive to March 1, 1982, for all its dealers operating under the new Dealer Agreement. Hess' asserted reason for the TVRA was the unanticipated severe decline in the retail gasoline market which developed in 1982. Under the TVRA plaintiff's monthly rental was reduced to $1,812.20. The March, 1982 TVRA, and consequently plaintiff's reduced rental rate, continues in effect today.

## DISCUSSION

In filing the present suit plaintiff contended that the rent charges demanded by Hess under the new Dealer Agreements were designed to force him and other franchisees like him out of their stations in contravention of the PMPA. In opposing Hess' motion for summary judgment, however, plaintiff appears to have modified his position. Now, plaintiff expressly states

that he does not question the right of Hess under the PMPA to adopt a new rental program for its dealers, so long as it is adopted in good faith and in the normal course of business. Plaintiff claims, however, that Hess' expert committed several errors in valuing his particular station, and that these errors support a finding that, or at least create an issue of fact as to whether, Hess acted arbitrarily and discriminatorily in violation of the PMPA by not applying its rental formula in a uniform and accurate manner.

■ In support of his claim of errors by Hess, plaintiff engaged his own appraiser, William D. Pugliese, to prepare an appraisal report to cover the value of the land at plaintiff's station and to determine the replacement cost of the improvements thereon. Nor surprisingly, plaintiff's expert appraisal resulted in land value and replacement cost figures which were significantly lower than those of Hess' expert. In view of plaintiff's position as supported by his expert's opinion, it cannot be said that there are no issues of fact on this aspect of the dispute. Nonetheless, given that the accepted test for violation of the PMPA by a franchisor is whether changes or additions in the franchise agreement were made by the franchisor in good faith, *see Munno v. Amoco Oil Co.,* 488 F.Supp. 1114 (D.Conn. 1980), the different conclusions of the parties' experts are, in effect, immaterial and thus summary judgment is not precluded.

Section 102(b)(1) of the PMPA, 15 U.S.C. § 2802(b)(1), allows a franchisor like Hess to terminate or fail to renew its franchise if after appropriate notice the franchisor's decision is based upon a ground enumerated in that section. The Act confers a right of action in federal court if a franchisor fails to comply with its requirements governing termination or nonrenewal.[2] 15 U.S.C. § 2805. Paragraph (3) of Section 2802 provides in relevant part:

(3) For purposes of this subsection, the following are grounds for nonrenewal of a franchise relationship:

(A) The failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if—

■ such changes or additions are the result of determinations made by the franchisor in *good faith and in the normal course of business;* and

(ii) such failure is *not* the result of the franchisor's insistence upon such changes or additions *for the purpose of preventing the renewal of the franchise relationship.*

15 U.S.C. § 2802(b)(3) (emphasis added).

■ The legislative history of the PMPA and relevant case law interpreting it establish that good faith as used in the statute means the franchisor's subjective good faith and not the objective reasonableness of the franchisor's acts, nor the alleged impact of those acts on any individual franchisee. Senate Report No. 95–731, 95th Cong., 2d Sess., 37, reprinted in 1978 U.S.Code Cong. and Admin.News, pp. 873, 895–96 [Senate Report]. *See Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1222 (7th Cir.1982); *Thompson v. Kerr-McGee Refining Corp.,* 660 F.2d 1380 (10th Cir.1981); *Ferriola v. Gulf Oil Corp.,* 496 F.Supp. 158 (E.D.Pa.1980); *Munno v. Amoco Oil Co.,* 488 F.Supp. 1114, 1118–21 (D.Conn.1980). The PMPA places the initial burden of proving good faith on the franchiser. 15 U.S.C. § 2805(c). Thereafter, proof of intent by either party as the situation dictates may be established by legitimate inferences from circumstantial evidence and need not be proved by direct evidence of an actual state of mind. *Munno v. Amoco Oil Co., supra,* 488 F.Supp. at 1120.

■ The legislative history further shows that judicial examination of whether the franchisor's actions were undertaken "in the normal course of business" is not meant

---

**2.** Hess contends as a threshold matter that the PMPA creates a cause of action only for termination or nonrenewal of the franchise relationship. Since plaintiff signed the new Dealer Agreement and never received notice of nonre-

newal or termination, Hess argues that there is no basis for relief under the PMPA. The Court disagrees for the reasons stated in *Meyer v. Amerada Hess Corp.,* 541 F.Supp. 321, 328–329 (D.N.J.1982).

to afford scrutiny of the reasonableness' of the particular business judgment. Rather, the courts are limited to the narrow question of whether the franchisor's determination was "the result of the franchisor's normal decisionmaking process." Senate Report, supra, at 896. The overall purpose of the good faith and normal course of business tests is to "provide adequate protection of franchisees from arbitrary or discriminatory termination or nonrenewal, yet avoid judicial scrutiny of the business judgment itself." Senate Report, supra, at 896.

█ In the present case, plaintiff does not challenge Hess' assertion that the rent changes were undertaken in good faith and in the normal course of business. Indeed the evidence is overwhelming in Hess' favor on these points. After managerial recommendation in the face of documented economic considerations, Hess decided to restructure its dealer rentals. It did so in a uniform manner as to all its dealers based on criteria provided by an independent appraisal expert who did not know either the reason for the appraisal or the intended application of his conclusions. There is no evidence to show that the appraisals were not uniformly conducted without discrimination as to any particular dealer. Moreover, as a result of the rent changes, some Hess dealers were given rent decreases, others like plaintiff were given rent increases. This in itself reflects Hess' good faith.

Plaintiff argues that the issue in the present suit is not whether Hess made the determination to restructure its rental rates in good faith and in the normal course of business, but whether Hess applied its new rental formula correctly with respect to his station. This position ignores the fact that the PMPA only affords a franchisee relief if the franchisor is shown to have acted from an improper purpose. Even viewing the existing evidence with a critical eye, drawing every reasonable inference in plaintiff's favor, there is nothing in the present record which would rationally support a finding that Hess acted from an improper motive in an effort to prevent plaintiff from renewing his franchise. The

items in the rent formula calculation which plaintiff contends amount to error by Hess do not afford plaintiff grounds for relief under the PMPA. These items either: (1) fall under the rubric of business judgment; or (2) amount to mistakes which ultimately weigh in plaintiff's favor. As an example, there appears to be a fundamental disagreement between plaintiff and Hess as to how replacement cost should be calculated. This amounts to a dispute involving Hess' business judgment as to the methods and standards it wished to employ in order to derive a replacement cost figure for each station. As pointed out earlier, the legislative history of the PMPA expressly states that courts should not scrutinize the business judgments of franchisors. The Court notes that this is not a case where the business judgment rationale can be viewed as a mere pretext for discriminatory treatment since there is nothing to dispute Hess' proof that all stations were evaluated in the same way. Additionally, even assuming the existence of the claimed errors by Hess in evaluating the land value of plaintiff's station, this does not suffice to raise a question of fact as to Hess' motives given the overwhelming evidence of good faith by Hess as well as the not unfavorable impact of the particular errors cited. In short, the facts which plaintiff disputes are not material to his claim under the PMPA. Accordingly, since plaintiff does not dispute and since the Court has independently concluded that in restructuring its dealer rentals Hess acted in good faith in the normal course of business, Hess is entitled to summary judgment on Count I of the complaint alleging a cause of action under the PMPA.

█ Hess is also entitled to summary judgment on Count II of the complaint alleging a common law claim for breach of fiduciary duty. The PMPA in section 2806(a) states:

To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any fran-

chise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a). Thus, the PMPA expressly preempts the law in this field. To the extent that Pennsylvania common law would produce a different result in this case, it is of no effect.

An appropriate Order will be entered.