Dick **MILLETT**; Pat Waters; Don Zeller; David Van Meter; Robert Kalbfleisch, individuals, Plaintiffs–Appellants,

v.

**UNION OIL COMPANY OF CALIFORNIA, a foreign corporation dba UNOCAL 76, Defendant–Appellee.**

No. 92–36883.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 1994.

Decided May 12, 1994.

David S. Shannon, Shannon, Johnson & Bailey, Portland, OR, for plaintiffs-appellants.

Jeffrey C. Wishko, Bell & Ingram, Everett, WA, for defendant-appellee.

Before HUG, HALL and THOMPSON, Circuit Judges.

Opinion by Judge HALL.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Appellants were franchisees of entities owned by Appellee Union Oil Company of California ("Unocal"). Appellants argue that they are entitled to the goodwill value of their auto repair franchises because Unocal failed to give them the required notice of nonrenewal mandated by the Washington

Franchise Investment Protection Act ("FIPA"). The district court granted summary judgment in favor of Unocal, concluding that the FIPA's one-year notice requirement was preempted by the ninety-day requirement in the Petroleum Marketing Practices Act ("PMPA").

The district court had jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291 and we affirm.

## I.

Appellants operated "UNOCAL 76" service stations under motor fuel franchise agreements. They also entered into "Protech" franchise agreements, whereby their service stations provided guaranteed service for automotive repairs. The Protech franchisees paid a monthly franchise fee and were required to meet certain equipment standards and personnel training qualifications. Both the motor fuel franchises and the Protech franchises were owned and licensed by Appellee Unocal. Unocal also entered into service station leases with the Appellants.

As part of a plan to disinvest in Washington and Oregon, Unocal refused to renew the franchise agreements on both the motor fuel franchises and the Protech franchises at each Appellant's business. Pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2806(a), Unocal gave each Appellant greater than ninety-days notice that their motor fuel franchises were not being renewed. Appellants were not given separate notices of nonrenewal of the Protech franchises as Unocal relied on a section of the Protech Agreements stating that nonrenewal of the motor fuel franchise automatically triggered nonrenewal of the Protech franchise. Appellants argue that, under the Washington Franchise Investment Protection Act, Unocal must pay them the value of the Protech franchises' goodwill because they were not given the one-year notice of nonrenewal required by the FIPA.[1] Unocal contends that the FIPA's one-year notice provision is preempted by the PMPA's ninety-day notice requirement.

Each side argued that it was entitled to summary judgment on the preemption issue. The district court granted summary judgment in favor of Unocal, concluding that the FIPA's one-year notice requirement was preempted by the ninety-day requirement contained in the PMPA. This timely appeal followed.

## II.

■ A grant of summary judgment is reviewed de novo. *Jones v. Union Pacific R.R.*, 968 F.2d 937, 940 (9th Cir.1992). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Fed.R.Civ.P. 56(c); *Tzung v. State Farm Fire & Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989).

## III.

■ In granting summary judgment to Unocal, the district court found that the PMPA preempted all inconsistent state law, including the FIPA goodwill provisions. We therefore make an initial inquiry into the preemptory effect of the PMPA. The PMPA contains an express preemption section, which states:

> To the extent that any provision of this subchapter applies ... to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no state or any political subdivision thereof may adopt, enforce or continue in effect any provision of any law or regulation (including any remedy or penalty ap-

---

1. The FIPA goodwill provision states that it is unlawful to:

   [R]efuse to renew a franchise without fairly compensating the franchisee for the fair market value, at the time of expiration of the franchise, of the franchisee's inventory, supplies, equipment, and furnishings purchased from the franchisor, and goodwill, ...

   PROVIDED, That compensation need not be made to a franchisee for good will if (i) the franchisee has been given one year's notice of nonrenewal.
   Wash.Rev.Code § 19.100.180(2)(i).

plicable to any violation thereof) with respect to ... the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a). "In enacting the PMPA, Congress attempted to provide national uniformity of petroleum franchise termination law. The purpose of uniformity would be frustrated if the PMPA was not given its preemptory intent. Accordingly, we find the PMPA preempts all inconsistent state law." *In re Herbert,* 806 F.2d 889, 892 (9th Cir.1986). *See also Jimenez v. BP Oil, Inc.,* 853 F.2d 268, 272 (4th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989); *Atkins v. Chevron USA, Inc.,* 672 F.Supp. 1373, 1378 (W.D.Wash. 1987). While not conceding that the FIPA goodwill provisions are inconsistent with the notice provisions of the PMPA,[2] Appellants' central argument is that the Protech Agreements are separate from the motor fuel franchises and thus wholly outside the preemptive reach of the PMPA.

■ The PMPA was designed to serve two main objectives. The first was to provide protection for petroleum marketing franchisees against arbitrary or discriminatory terminations or nonrenewals of their service station franchises. S.Rep. No. 731, 95th Cong., 2d Sess. 19, *reprinted in* 1978 U.S.C.C.A.N. 873, 877 [hereinafter "Senate Report"]. The PMPA was also enacted to provide "adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." *Id.* The dispositive issue in this case is whether the Protech Agreements constitute franchises that are covered by the PMPA. If so, then the PMPA's ninety-day notice requirement

preempts the FIPA's one-year notice requirement and Appellants' argument for goodwill payments fails.

■ The PMPA defines a franchise as:

any contract ... under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

15 U.S.C. § 2801(1)(A).[3] We have previously interpreted this statutory text as defining "'[f]ranchise' as the combination of the franchisee's use of a franchisor's trademark, the lease of a service station, and the motor fuel supply contract." *Svela v. Union Oil Co.,* 807 F.2d 1494, 1500 (9th Cir.1987). This definition of franchise clearly encompasses the Unocal trademark and the Unocal motor fuel franchises. However, the definition does not facially include such entities as the Protech repair shops. *See Smith v. Atlantic Richfield Co.,* 533 F.Supp. 264, 267 (E.D.Pa. 1982), *aff'd,* 692 F.2d 749 (3rd Cir.1982). Unocal relies on the statute's use of the phrase "in connection with the sale, consignment, or distribution of motor fuel" to argue that the statutory definition does not preclude the PMPA's application to the Protech Agreements. However, it is clear that Unocal cannot rely exclusively on the language of the PMPA to support its preemption argument.

The legislative history is helpful in determining what Congress intended to include within the term "franchise". The Senate Report on the PMPA clarifies the definition of franchise as follows:

---

2. We reject Appellants' argument that the FIPA's goodwill provisions do not contradict the PMPA. *See Atkins,* 672 F.Supp. at 1379 (holding that the FIPA goodwill provisions are inconsistent with and thus preempted by the PMPA's notice provisions); *Consumers Petroleum Co. v. Texaco, Inc.,* 804 F.2d 907, 915, 916 (6th Cir.1986) (finding that the PMPA preempted a state law which had the effect of frustrating the purpose behind the PMPA's notice provisions).

3. Unocal attempts to distinguish a "franchise" from a "franchise relationship". The term "franchise relationship" is inapplicable to this case. *See Midwest Petroleum Co. v. American Petrofina, Inc.,* 603 F.Supp. 1099, 1119–1120 (E.D.Mo.1985).

The term "franchise" is defined in terms of a motor fuel trademark license.... Secondary arrangements, such as leases of real property or motor fuel supply agreements, are incorporated in the definition of a franchise. Therefore, the substantive provisions of the title, relating to the termination of a franchise or non-renewal of the franchise relationship, may not be circumvented by a termination or non-renewal of the real estate lease or motor fuel supply agreement which thereby renders the trademark license valueless. The broader definition, however, is not intended to encompass other contractual arrangements which may exist between a franchisor and a franchisee, e.g. credit card arrangements, contracts relating to financing of equipment, or contracts for purchase and sale of tires, batteries, or automotive accessories.

Senate Report, *supra*, at 888. While defining franchise in terms of a motor fuel trademark license, the Senate Report makes clear that the definition includes certain secondary arrangements. Given that the Protech Agreements are likely not encompassed within the PMPA's definition of franchise, the issue becomes whether they can be considered secondary arrangements and thus still fall within the coverage of the PMPA.

Unfortunately, the Senate Report fails to conclusively establish whether the Protech Agreements are secondary arrangements incorporated into the PMPA's definition of franchise. The Report mentions two types of arrangements, real property leases and motor fuel supply agreements, that are clearly covered by the PMPA. The Report also specifies certain agreements, such as credit card arrangements, contracts relating to financing of equipment, and contracts for the purchase and sale of automotive accessories, that are not incorporated into the definition of franchise. The Protech Agreements do not fit into the category of arrangements that are either specifically included, or specifically excluded, from the definition of franchise.

The statutory language and legislative history fail to clearly establish Congress' intent regarding the scope of the PMPA's definition of franchise. While these sources do not prohibit a finding that the Protech Agreements are secondary arrangements falling within the ambit of the PMPA, they also do not provide significant support for such a finding. Thus, we turn to the case law addressing secondary arrangements under the PMPA.

There have been several district court decisions addressing PMPA secondary arrangements. The three most important of these cases involve AM/PM mini-market franchises located on the same premises as ARCO motor fuel franchises. In *Smith v. Atlantic Richfield Company,* the court decided whether the PMPA's jurisdiction extended to prevent the termination of an AM/PM mini-market franchise located on the same premises as a motor fuel franchise. The court held that only secondary arrangements that were "essential" to the operation of the motor fuel franchise were covered by the PMPA. *Smith,* 533 F.Supp. at 269. Finding as a matter of law that the mini-market was not essential to the motor fuel franchise, the court dismissed for lack of jurisdiction. *Id.* As noted by Unocal, however, *Smith* was not a PMPA § 2806(a) preemption case and did not involve the termination of a motor fuel franchise. Rather, the case dealt solely with the termination of a mini-market franchise.

A contrary result was reached in *Atlantic Richfield Co. v. Brown,* No. 85–C–5131 (N.D.Ill. Oct. 21, 1985), where the district court was faced with an arrangement whereby the nonrenewal of a premises lease and motor fuel lease automatically triggered termination of an AM/PM mini-market agreement. In holding that the PMPA preempts application of Illinois state law to the mini-market, the court reasoned that the Arco leases for the premises, fuel, and mini-market were so inextricably linked that the PMPA governed the secondary mini-market agreement as well as the other two primary agreements. The mini-market agreement was found to reflect Arco's intent to permit franchisees to sell groceries only as long as the franchisee sells motor fuel.

In the third case, *Aurigemma v. Arco Petroleum Products Co.,* 698 F.Supp. 1035, 1041 (D.Conn.1988), the PMPA was found not to extend to an AM/PM mini-market

franchise connected with a fuel franchise where there was insufficient interdependence between the two franchises. The court, concluding that the requisite connection did not exist, noted that "[t]he decision to withdraw from the sale of petroleum products in Connecticut does not necessarily vitiate the continued operation of the AM/PM stores." *Id.* In reaching this result, the court relied on two factors: 1) an Arco manager testified that the mini-markets could exist without petroleum franchises; and 2) there were, in fact, numerous AM/PM stores that operated without the sale of petroleum products. *Id.*

While reaching different conclusions, the district courts in these three cases used a similar methodology to determine the extent of the PMPA's coverage. Each court focused on the degree of interrelation that existed between the secondary franchise and the franchises that were expressly controlled by the PMPA. *See Smith,* 533 F.Supp. at 268 (asking whether secondary arrangement is essential to motor fuel franchise); *Brown,* No. 85–C–5131 (asking whether secondary arrangement is inextricably linked to motor fuel franchise); *Aurigemma,* 698 F.Supp. at 1041 (examining degree of interdependence between secondary franchise and motor fuel franchise).[4]

■ Examining the arrangements presently at issue, we conclude that the Protech Agreements are sufficiently related to the Unocal motor fuel franchises so as to be covered by the PMPA. The Protech system is available only to Unocal motor fuel dealers and nonrenewal of the motor fuel lease automatically terminates the Protech Agreements. Further, the Protech Agreement is subordinate to the motor fuel lease and in the event of an inconsistency, the motor fuel lease controls. Appellants also made admissions regarding the linked nature of the two franchises. On these facts, the decision to terminate the Unocal motor fuel franchise does "necessarily vitiate the continued operation of the [Protech repair shops]" and the PMPA thus applies. *See Aurigemma,* 698 F.Supp. at 1041.

The interdependence between the Unocal franchises and the Protech Agreements is clearly greater than the connection existing between the Arco franchises and the mini-markets in any of the three cases discussed above. Also, allowing the FIPA goodwill provisions to effectively lengthen the nonrenewal notice period would contradict the congressional objective of permitting franchisor flexibility to respond to changing market conditions. *See Consumers Petroleum Co.,* 804 F.2d at 915; *Atkins,* 672 F.Supp. at 1378–79. Accordingly, we find that the Protech Agreements are sufficiently related to the Unocal motor fuel franchises to come within the meaning of the PMPA and thus the FIPA goodwill provisions are preempted.[5]

The district court's grant of summary judgment to Unocal is AFFIRMED.

---

4. While all three courts examined the interrelationship between the various franchises, the focus of the tests differed. The *Brown* and *Aurigemma* courts, despite reaching opposite conclusions, each concentrated on the effect termination of the primary franchise would have on the secondary agreement. *See Brown,* No. 85–C–5131; *Aurigemma,* 698 F.Supp. at 1041. In *Smith,* however, the court focused on the effect termination of the secondary agreement would have on the primary franchise. *See Smith,* 533 F.Supp. at 268.

5. Appellants also argue that Unocal is estopped from raising the defense of preemption because Unocal: 1) did not recognize Appellants' PMPA rights in terminating the Protech franchises; and 2) initially represented that the FIPA would apply to the Protech franchises. This argument is without merit. Appellants have not provided evidence sufficient to establish that Unocal made representations inconsistent with its PMPA preemption defense, nor that if such representations were made, Appellants actually relied on them. The elements of estoppel are not present here and thus Appellants' argument fails.